## Case No. 17,382.

### WELLING v. RUBBER-COATED HARNESS TRIMMING CO. et al.

[1 Ban. & A. 282;[1] 7 O. G. 606.]

Circuit Court, D. New Jersey. May, 1874.[2]

PATENTS — CONSTRUCTION OF CLAIMS — INFRINGEMENT OF COMBINATION—MARTINGALE RINGS.

1. In the specification of letters patent, granted to William M. Welling, March 17, 1863, for "a new and useful improvement in rings for martingales," he described, as a new article of manufacture, a martingale-ring formed by taking a metallic ring, and a sufficient amount of any suitable composition, preferably an artificial ivory composition, called "factitious ivory" previously invented by him, and by dies or by hand, causing the composition to completely envelop the metallic ring, the mass of composition being pressed and solidified around it, by means of dies: the object of using the metallic ring inside of the ivory composition being to give it strength. The patentee claimed, "the ring for martingales, etc., manufactured as set forth, with a metal ring enveloped in composition as and for the purpose specified:" Held, that the patent would cover the application of hard rubber to a metal ring by means of dies.

2. The fact that the rubber must necessarily undergo the additional process of vulcanization, does not exempt it from the control of the patent. Though not the same substance, in its essence and constituents, as the "factitious ivory," it is a similar material as regards its capability of being adapted to the purposes for which the factitious ivory is used.

3. The Welling patent, construed to be for a metal ring surrounded with some plastic composition, like artificial ivory, capable of being compressed, solidified, and polished by the action of dies, and which is, in fact, subjected to such action, whereby a martingale ring is produced with an exterior surface more durable

---

[1] [Reported by Hubert A. Banning. Esq., and Henry Arden, Esq., and here reprinted by permission.]

[2] [Reversed in 97 U. S. 7.]

and more highly polished than had before been obtained by different processes.

4. The Welling invention held not to have been anticipated by rings made of ivory, or of compositions known as artificial, factitious or imitation ivory, or of metal coated with varnish, lacquer, japan, enamel, porcelain, or metallic plating, such coatings being applied with a brush or the fingers or fused on by heat.

5. A patent for a combination is infringed by the use of a similar combination, although one of the elements is omitted and another substituted for it. unless the substituted device is a new one, or was not known at the date of the patent as a proper substitute for the one omitted.

[This was a bill in equity by William M. Welling against the Rubber-Coated Harness Trimming Company and others for infringement of a patent.]

Frederick H. Betts, for complainant.

J. C. Clayton, for defendants.

NIXON, District Judge. This is a suit for an alleged infringement of letters patent No. 37,941, and bearing date March 17, 1863, granted to the complainant for "a new and useful improvement in rings for martingales;" and the questions in issue are determined by the construction and scope to be given to the specifications and claim of said patent.

The schedule annexed is dated April 8, 1862, and the complainant therein states his invention as follows: "In letters patent granted to me August 4, 1857, a composition and mode of making factitious ivory is set forth, and out of said materials, I have manufactured billiard balls, rings of various kinds, etc. My present invention does not relate to any particular composition, as that in the aforesaid patent, or any similar compound, may be employed. The nature of my said invention consists in the employment of a metallic ring within a ring formed of artificial ivory or similar materials, for giving strength to the same, thereby producing a new article of manufacture, and one that is stronger than an ivory ring, and possesses all the beauty of appearance, and can be afforded at a very much less cost. Ivory rings, particularly such as used for martingales, require to be made out of very solid ivory in order to be sufficiently strong, and hence are quite costly. In order to make my improved rings, I take a ring of metal such as shown at A; or said ring may be formed by punching out a washer from a sheet of metal, or in any other suitable way. I take the amount of artificial-ivory composition, and by dies or by hand cause the said composition to completely envelop the said ring with as much uniformity as possible, and to give the exterior finish to the same, press and solidify the mass of composition around the ring by means of dies, and in so doing, any plain, or more or less ornamental shape, may be given to the said ring or the surface thereof. My ring is thus made of the desired ornamental appearance, while great strength is attained at very little cost. What I claim, and desire to secure by letters patent, is, the ring for martingales, etc., manu-

factured as set forth, with a metal ring enveloped in composition, as and for the purposes specified."

It is insisted by the defendants that if the patent is valid at all, it must be limited to a "martingale ring intended to imitate ivory, and made by covering a metallic ring with artificial ivory, such as is described in complainant's patent of 1857, or some similar compound." Bearing in mind the established American rule, that patents are to be construed liberally, and are not to be subjected to a rigid interpretation, I think that this construction is too narrow, and does not give to the patentee all that he is entitled to, under the specifications and claims of his patent. It is quite clear, indeed, that factitious ivory was the composition uppermost in his thoughts. Having the partiality of a parent for his offspring, he naturally imagined that no superior compound could be formed or used. It may be conceded that the full extent of his invention had not then dawned upon him. Men often build better than they know; but where the fair interpretation of the words employed to describe an invention or discovery includes matters not in the mind of the patentee at the time, he is as fully authorized to claim the unlooked-for as he is the anticipated results.

The specifications are not well drawn, either as to the grammatical construction of the sentences, or in the use of words to clearly convey the inventor's meaning. This is not adverted to because it is supposed that bad grammar or infelicitous methods of expression will avoid a patent, but because it is the duty of the court to ascertain the nature and the scope of the invention from the sense of the words which have been used in explaining it; and the same exact rule of interpretation is not to be applied at all times, but such, in each case, as will best enable the court to arrive at the meaning intended.

It is clear that the patentee had no thought of confining himself, or others, to the use of the factitious ivory; for, after referring to his patent of 1857, he says: "My present invention does not relate to any particular composition, as that (factitious ivory) or any similar compound may be employed. The nature of my invention consists in the employment of a metallic ring within a ring formed of artificial ivory or similar materials, for giving strength to the same," etc. He then claims "a ring for martingales, etc., manufactured as set forth, with a metal ring enveloped in composition" generally, "as and for the purposes aforesaid."

To understand, and correctly interpret, the patent, some reference may properly be made to the state of the art. The defendant's expert, Mr. Hedrick, who seems to be an intelligent witness, says, that prior to 1862 martingale rings were made in a variety of ways, and of different materials—of ivory, of compositions known as artificial, factitious or imitation ivory, of metal coated with varnish, lacquer, japan, enamel, porcelain, metallic plating, and compounds of rubber and gutta percha, and leather.

The only known methods of applying the coatings to the iron ring, were, by a brush, or the fingers, or fusing on to it by heat. The ring gave the strength to the manufactured article, and the coating the exterior finish.

The object of the complainant, by his invention, was to introduce an improvement upon the known methods of coating, whereby he would impart strength, durability, and greater polish to the surface, thus producing a more valuable, useful, and beautiful result. His instrumentalities were all old—an iron ring, a plastic composition, and a die; but, so far as appears in the case, they were new in combination. If his patent had been simply for a metallic ring, covered with any compound capable of being moulded, or with factitious ivory or similar materials, it would have been void for want of novelty. If it had been for the use of the die in pressing or solidifying plastic substances generally, it would have been, probably, anticipated, in this regard, by the English letters patent to Barnwall and Rollason of 1860, in which such use of dies is plainly indicated. But the invention is for a combination, and the combination is a metal ring surrounded with some plastic composition, like artificial ivory, of such a nature, that it is capable of being compressed, solidified, and polished by the action of the dies, and which is, in fact, subjected to such action, whereby a martingale ring is produced with an exterior surface more durable, and more highly polished, than had before been obtained by different processes of manufacture, and at greater cost.

Have the defendants infringed the patent of the complainant, thus interpreted? Mr. Albright frankly tells us what they have been doing. He is called as a witness by the complainant, and is asked to detail the process, by which certain rubber rings of their manufacture, are made. He says (C. R. p. 17): "We take an iron ring, sheet or sheets of rubber rolled to the proper thickness, cut from the sheet a piece in the proper form, and envelop the iron ring with the covering of rubber, pressing the edges in the form of a lap with the fingers, causing the rubber to adhere and to become a homogeneous piece or cover. * * * The ring, when covered, has this outer coating of rubber in a plastic state. The ring is then placed in an oven and vulcanized. After the ring is taken from a vulcanator, after vulcanization, it is of irregular form or shape. We, to make the regular form or shape desired, put it in a lathe chuck, and turn it up in the form or shape desired, or by the use of a steel die, engraved in certain form to produce a ring, with such ornamentations on the outer ring as may be desired. The seam, or imitation stitch, is made by impressions from the die," etc. He further states that he manufactured the rings produced under letters patent bearing date October 9, 1866, February 12, 1867, February 13, 1872, and December 3, 1872; that he commenced the use of dies over two

years ago, to save expense in the production of the rings; that he claims to have been the inventor in the use of dies for such purpose; and that their use for shaping and ornamenting the articles is a valuable improvement.

The letters patent under which he justifies his action, and claims protection, have been issued or reissued to him, as inventor or assignee, several years since the date of the complainant's invention, and have been exhibited in the case. I have examined their specifications and claims with some care, and am unable to find anything in them, essential to the result, which is not anticipated by the Welling patent. For instance, in the specifications to the letters patent granted February 13, 1872, and reissued November 26, of the same year, he states, that he takes a metallic ring, a composition of vulcanizable gum of a consistency about equal to stiff dough, rolls it into sheets of uniform thickness, and applies it to the ring, working or pressing it to the metal, by the hand, or otherwise. It is then placed in moulds of proper shape, and vulcanized by the usual process, after which, the article is ready for the action of the dies. "The dies to be used should be a very little smaller than the article to be pressed, so that they may thoroughly compress and densify the coating upon the metal. They should have cutting edges, so as to shear off the superfluous coating, and should be provided with suitable indentations or engravings, so as to produce the desired ornamentations. * * * The dies now being ready are slightly heated, and the vulcanized articles are put, one at a time, in the lower die, while the upper die is pressed or dropped down upon it, with great pressure. As the dies act upon the coating with equal pressure in all directions, the coating is made homogeneous, dense, hard, tough, and susceptible to high polish, and is rendered more durable and better, than if it were not so pressed. The dies, at the same time, cut off the superfluous coating, apply ornamentation, if desired, and impart a considerable polish, thus doing away with much labor in 'tumbling,' 'finishing,' and 'polishing.'"

We have only to compare this description with the specification of the complainant's patent, to ascertain the substantial identity of the two methods. He, also, takes a metallic ring, the necessary amount of artificial ivory composition to form the covering, and, by dies or by hand, causes the said composition to completely envelop the ring with as much uniformity as possible; and, to give the exterior finish to the same, presses and solidifies the mass of composition around the ring by means of dies, and in so doing, any plain or more or less ornamental shape may be given to the ring, or the surface thereof. The ring is thus made of the desired ornamental appearance, while great strength is attained, at very little cost.

It will be perceived, that the only change made by the defendant's patent, is the substitution of a plastic composition known as rubber or gutta-percha, which necessitates the additional process of vulcanization, for the plastic composition called factitious ivory; not the same substance, indeed, as to its essence and constituents, but a similar material, in regard to its capability of being adapted to the purpose for which the former is used. It has not even the merit of novelty, for the English patent of Newton, granted in 1851, which was first exhibited in the case by the defendants, and, being withdrawn by them, was afterward marked as an exhibit for the complainant, clearly suggests this precise use of the material, without the application of dies. In his specification he says:

"When it is desired that the compound of caoutchouc or gutta-percha shall serve as a covering to the iron or other substance, a thin sheet of the compound is pressed with great care upon the iron or other substance, so as to expel all air from between the adjoining surfaces, and to cause the most perfect union and adhesion; the coated article is bound with strips or ribbons of cloth, whereby the compound is kept in close contact with the article during the process of hardening. The combined materials, thus treated, will be found to possess the qualities desired, the iron or other substance giving strength, and the compound giving a hard and durable surface. In this way, may be produced many articles used in and about harness or carriages, such as saddle-trees, buckles, martingale rings, dasher irons," etc., etc.

It was held, in a recent case in this court, —Webster v. New Brunswick Carpet Co. [Case No. 17,337],—that a patent for a combination is infringed by the use of a similar combination, although one of the elements is omitted and another substituted for it, unless the substituted device is a new one, or performs a function essentially different, or was not known at the date of the patent as a proper substitute for the one omitted.

It would seem, therefore, that the defendants are not permitted to shield themselves from the consequences of infringement, by incorporating into a patent the inventions of others, without, at the same time, so changing and adjusting the relations of the constituents thus taken, as to produce a new and useful result. They have failed to show that this has been done.

But, irrespective of this view, I am of the opinion, on the whole case, that the claim of the complainant's patent, fairly construed, is not to be limited to the use of factitious ivory; that it is broad enough to include the composition of rubber or gutta-percha, and that there should be a decree for the complainant, according to the prayer of his bill.

[NOTE. On appeal to the supreme court the decree of this court was reversed, and the cause remitted, with directions to enter a decree dis-

missing the bill of complaint, with costs.  97 U. S. 7.  For an application for an attachment against defendants for violating an injunction of this court, see Case No. 17,383.]